WILLIAM L. SCHMIDT, SBN 206870[1]
legal.schmidt@gmail.com
WILLIAM L. SCHMIDT, ATTORNEY
AT LAW, P.C.
P.O. Box 25001
Fresno, CA 93729
Telephone: (559) 261-2222
Facsimile: (559) 436-8163

STEWART GOLLAN, Utah Bar No. 12524
sgollanlaw@gmail.com
GOLLAN LAW, PLLC
584 Wall Street
Salt Lake City, Utah 84103
Telephone: (801) 413-3406

R. SHANE JOHNSON, Utah Bar No. 14217
shane@utahdefense.com
R. SHANE JOHNSON, PLLC
24 D Street
SALT LAKE CITY, UTAH 84103
Telephone: (801) 364-2222

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH
NORTHERN DIVISION

| | |
|---|---|
| RONALD MAY, *et al.*<br><br>    *Plaintiff*,<br><br>vs.<br><br>UTAH DEPARTMENT OF CORRECTIONS, *et al.*,<br><br>    *Defendants*. | PLAINTIFFS' MOTION FOR PLELIMINARY INJUNCTION<br><br>(MEMO INCLUDED)<br><br>(ORAL ARGUMENT REQUESTED)<br><br>Civil Action No. 2:18-cv-00854-RJS<br><br>Judge Robert J Shelby |

---

[1] Admitted *Pro Hac Vice*

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Ronald May, Toby Garcia, Todd Mulder, Curtis Ellis, and the unnamed class members move this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for preliminary injunctive relief requiring Defendants to provide lifesaving direct-acting antiviral medications ("DAA") to all prisoners incarcerated by the Utah Department of Corrections ("UDOC") infected with the hepatitis C virus ("HCV").

## Summary of Argument

Plaintiffs are prisoners incarcerated by the Utah Department of Corrections ("UDOC") who suffer from chronic HCV. Defendants are refusing to provide lifesaving medications to the thousands of people incarcerated by UDOC infected with HCV, despite the availability of a medication regimen which is 95 % effective at providing a total cure and which is now the required standard of care for all chronic HCV patients.[2] This policy, practice, and custom has resulted in the suffering and probable death of numerous prisoners, and puts thousands of others at serious risk of experiencing liver failure, cancer, and death. Plaintiffs are highly likely to prevail on their claims that Defendants' refusal to provide required care for these prisoners' serious medical needs violates the Eighth Amendment to the U.S. Constitution, the Americans with Disabilities Act, and the Rehabilitation Act. Because all necessary elements for a preliminary injunction are satisfied, this Court should issue a preliminary injunction requiring Defendants to cease their unconstitutional and illegal practices.

---

[2] *See* HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, published by The American Association for the Study of Liver Disease and the Infectious Disease Society of America, 2018 (hereafter "HCV Guidance), available at https://www.hcvguidelines.org/evaluate/when-whom (last visited June 16, 2019), hereafter ("HCV Guidance").

**Factual Background**

*Hepatitis C Disease*

HCV is a blood borne disease caused by the hepatitis C virus. The virus causes inflammation that significantly impairs liver function and damages the liver's crucial role in digesting nutrients, filtering toxins from the blood, preventing disease, and making possible essentially all metabolic processes in the body.[3] HCV is the most common reason for liver transplants in the United States.[4]

HCV can be acute or chronic.[3] Acute HCV is defined as presenting within 6 months of the exposure.[5] While acute HCV can be a short-term illness, for 75%-85% of those infected with HCV, acute infection leads to chronic infection. *Id.* Of those with chronic HCV, the majority develop chronic liver disease and approximately 15-30% will develop cirrhosis (a condition in which your liver is scarred and permanently damaged, which can lead to liver failure).[6]

The liver inflammation caused by chronic HCV can significantly impair liver function.

---

[3] Centers for Disease Control and Prevention, Viral Hepatitis – Hepatitis C Information (hereafter "CDC Hepatitis C Information"), Overview, available at https://www.cdc.gov/hepatitis/hcv/cfaq.htm#D5 (last visited August 21,2019); *see also* HCV Guidance, available at https://www.hcvguidelines.org/unique-populations/acute-infection (last visited September 15, 2019)).

[4] CDC Hepatitis C Information, Overview, available at https://www.cdc.gov/hepatitis/hcv/cfaq.htm (last visited July 3, 2019).

[5] CDC Hepatitis C Information, Overview, available at https://www.cdc.gov/hepatitis/hcv/cfaq.htm#D5 (last visited August 21,2019)

[6] CDC Hepatitis C Information, Overview, available at https://www.cdc.gov/hepatitis/hcv/cfaq.htm (last visited July 3, 2019); United States National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, Health Information Liver Disease Cirrhosis Definition & Facts, available at https://www.niddk.nih.gov/health-information/liver-disease/cirrhosis/definition-facts (last visited September 15, 2019).

Liver inflammation may cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.[7]

People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is

damaged by scar tissue.[8] The extent and severity of liver fibrosis is generally measured on a

scale from 0-4.[9] Chronic HCV may also lead to liver cancer.[10]

As chronic HCV infection advances it causes Cirrhosis (a condition in which the liver is

permanently damaged as scar tissue replaces healthy liver tissue and prevents your liver from

working normally).[11] Cirrhosis may cause complications including loss of  appetite, weight loss,

nausea, vomiting, abdominal pain, widespread itching, kidney disease, jaundice, bruising and

bleeding, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in

the esophagus or intestines which can burst), abdominal ascites (the accumulation of fluid),

mental confusion, memory loss, personality changes, sleep disorders, lymph disorders, and

---

[7] *Id.*
[8] Advances in the diagnosis and treatment of liver fibrosis, Jenny Yeuk-Ki Cheng, Grace Lai-Hung Wong, Hepatoma Res 2017;3:156-69, available at https://hrjournal.net/article/view/2197 (last visited September 15, 2019).
[9] Evaluation and Staging of Liver Fibrosis, Paula P. Cox-North, PhD, APRN, Margaret C. Shuhart, MD, MS, available at https://www.hepatitisc.uw.edu/go/evaluation-staging-monitoring/evaluation-staging/core-concept/all (last visited September 15, 2019).
[10] Centers for Disease Control and Prevention, Hepatitis C Questions and Answers for the Public Hepatitis C Questions and Answers for the Public, available at https://www.cdc.gov/hepatitis/hcv/cfaq.htm#D1 (last visited September 9, 2019)
[11] United States National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, Cirrhosis Definitions and Facts, available at https://www.niddk.nih.gov/health-information/liver-disease/cirrhosis (last visited September 15, 2019).

extreme fatigue.[12] Ultimately, cirrhosis can cause death.[13]

*Hepatitis C in Prison*

HCV-associated liver disease is a frequent cause of death in inmates, surpassing death

from HIV.[14] 1 in 3 of the approximately 2.2 million people in US jails and prisons are infected

with HCV.[15] National experts in disease prevention and evidence-based medicine recommend

HCV testing for all inmates.[16]

---

[12] United States National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, Symptoms & Causes of Cirrhosis, available at https://www.niddk.nih.gov/health-information/liver-disease/cirrhosis/symptoms-causes (last visited September 15, 2019); Renal failure in cirrhosis: Emerging concepts, Paulo Lisboa Bittencourt, Alberto Queiroz Farias, and Carlos Terra, World J. Hepatol. 2015 Sep 28; 7(21): 2336–2343, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4577641/ (last visited September 15, 2019); Variceal bleeding in cirrhotic patients, Maxime Mallet, Marika Rudler, and Dominique Thabut, Gastroenterol Rep (Oxf). 2017 Aug; 5(3): 185–192, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5554384/ (last visited September 15, 2019); The lymphatic vascular system in liver diseases: its role in ascites formation, Chuhan Chung and Yasuko Iwakiri, Clin Mol Hepatol. 2013 Jun; 19(2): 99–104, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3701854/ (last visited September 15, 2019).

[13] Centers for Disease Control and Prevention, National Center for Health Statistics,

[14] HCV Guidance, available at https://www.hcvguidelines.org/unique-populations/correctional (last visited July 1, 2019))

[15] Centers for Disease Control and Prevention, Hepatis and Incarceration, available at https://www.cdc.gov/hepatitis/hcv/pdfs/hepcincarcerationfactsheet.pdf (last visited April 14, 2019).

[16] Centers for Disease Control and Prevention, Viral Hepatitis – Hepatitis C Information, Overview, Available at https://www.cdc.gov/hepatitis/hcv/cfaq.htm (last visited July 3, 2019) referencing https://www.uspreventiveservicestaskforce.org/Page/Document/RecommendationStatementFinal/hepatitis-c-screening (last visited July 1, 2019); *see also* HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, published by The American Association for the Study of Liver Disease and the Infectious Disease Society of America, available at https://www.hcvguidelines.org/unique-populations/correctional, (last visited 09/15/2019)(Jails and prisons should implement universal opt-out testing for HCV).

Approximately 6,200 inmates are housed in Utah prisons managed by UDOC.[17] Thus, best estimates indicate that there are more than 2000 inmates in Utah prisons infected with HCV.

*The Standard of Care for HCV Treatment*

In 2011 new, easy-to-administer oral medications called direct-acting antiviral ("DAA") drugs became available for the treatment of HCV.[18] Over 90% of HCV patients treated with these drugs are cured with 8-12 weeks of therapy.[19] In response to the introduction of DAA medications, a panel of experts from the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") conducted an extensive review of the testing, management, and treatment of HCV. The results and recommendations of the IDSA/AASLD review were published in a comprehensive document called the "HCV Guidance." [20] Both the Centers for Disease Control and Prevention ("CDC") and the Federal Bureau of Prisons ("BOP") strongly encourage all health professionals to follow the evidence-based standard of care developed by the IDSA/AASLD.[21]

"Patients who are cured of their HCV infection [by DAA treatment] experience numerous

---

[17] See Utah Justice Reinvestment Initiative ("JRI") 2017 Annual Report (https://justice.utah.gov/JRI/Documents/Justice%20Reinvestment%20Initiative/JRI%202017%20Annual%20Report.pdf , last visited April 12, 2019).

[18] HCV Guidance (available at https://www.hcvguidelines.org/contents/welcome; U.S. Library of Medicine, National Institutes of Health, Direct Acting Anti-hepatitis C Virus Drugs: Clinical Pharmacology and Future Direction, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5490957/ (last visited July 1, 2019).

[19] CDC Hepatitis C Information, Overview, available at https://www.cdc.gov/hepatitis/hcv/hcvfaq.htm#d2a (last visited July 3, 2019)).

[20] HCV Guidance, available at https://www.hcvguidelines.org/evaluate/when-whom (last visited June 16, 2019.)

[21] See CDC Hepatitis C Information, available at https://www.cdc.gov/hepatitis/hcv/hcvfaq.htm#d2a; B\Federal Bureau of Prisons HCV Recommendations, https://www.bop.gov/resources/pdfs/hepatitis_c.pdf

health benefits, including a decrease in liver inflammation . . . and a reduction in the rate of liver fibrosis progression.[22]

Due to the dramatic and undisputed benefits of DAA medications, the medical standard of care outlined in the HCV Guidance, is to immediately treat all patients with chronic HCV with DAA medications, regardless of the type of HCV or the stage of the patient's disease.[23] Treatment at early stages of fibrosis augments the benefits of DAA treatment.[24] For early stage fibrosis patients, the 15-year survival rate is significantly better for those who experience [a cure of HCV] than for those whose treatment failed or for those who remain untreated.[25] Irreversible damage to the liver may occur when the disease advances to cause cirrhosis. Thus, the prevailing standard of care requires that health care providers not withhold treatment simply because the patient is asymptomatic or shows no or minimal evidence of fibrosis.[26]

*Testing for HCV In Correctional Institutions*

HCV infection disproportionately affects individuals in correctional institutions.[27] Both the IDSA/AASLD and the Federal Bureau of Prisons recommend an opt-out strategy of testing for HCV infection for all sentenced inmates.[28] An "opt out" approach involves an informed

---

[22] *Id.*

[23] HCV Guidance, available at https://www.hcvguidelines.org/evaluate/when-whom (last visited August 12, 2019).

[24] *Id.*

[25] *Id.*

[26] HCV Guidance – When and in Whom to Initiate HCV Therapy, available at https://www.hcvguidelines.org/evaluate/when-whom.

[27] HCV Guidance, Unique Populations, available at https://www.hcvguidelines.org/unique-populations/correctional.

[28] HCV Guidance, https://www.hcvguidelines.org/unique-populations/correctional; https://www.bop.gov/resources/pdfs/hepatitis_c.pdf.

refusal of testing, rather than informed consent (or "opt in") for testing.[29]

*UDOC Policies Regarding HCV Treatment*

UDOC became aware that DAA medications are the standard of care for treatment of those diagnosed with chronic HCV at least as early as 2014.[30]  However, a mere five or six prisoners receive DAA medications/HCV treatment under the UDOC protocol annually.[31] Instead, UDOC only tracks prisoners with already known HCV infection, periodically tests them, and does not treat them.[32] The protocol states that UDOC is "seeking special funding to support the treatment with new HCV medications due to the tremendous financial burden…" and "[o]nly the most ill patients will qualify for treatment as funding is approved by the state legislature."[33] In contravention of the standard of care, the protocol states that "Not everyone with hepatitis C needs treatment right away" and that only those with evidence of "significant, Grade 4, liver disease with severe fibrosis" who have likely already suffered significant and potentially irreversible liver damage and increased risk of severe side effects and potentially death will receive treatment.[34] Plaintiffs seek an order of the Court requiring Defendants to cease this unconstitutional and illegal practice of denying life-saving treatment to inmates with chronic HCV.

---

[29] Federal Bureau of Prisons Clinical Guidance
https://www.bop.gov/resources/pdfs/hepatitis_c.pdf.
[30] Margot Sanger-Katz, Why the Hepatitis Cure Sovaldi is a Budgetary Disaster for Prisons, The New York Times, Aug. 7, 2014, Pl.'s Ex. 1, p. 3, ("We don't have a choice—it's the new standard of care," according to then-UDOC Medical Director Richard Garden).
[31] Exhibit A (received by Plaintiff Toby Garcia in Response to formal grievance).
[32] A copy of the UDOC treatment protocol is attached as Exhibit "A," received by Plaintiff Toby Garcia in response to formal grievance.
[33] *Id.*
[34] *Id.*

***The Effects of UDOC Policy on Plaintiffs and the Plaintiff Class***

*Plaintiff Todd Mulder*

Todd Mulder ("Mulder") was diagnosed with HCV in approximately 2001. He has been denied treatment with DAA medications despite the fact that he has requested such treatment and filed formal grievances seeking treatment. He already experiences joint pain and fatigue. UDOC continues to deny him treatment.

*Plaintiff Curtis Ellis*

Curtis Ellis ("Ellis") has been living with HCV for at least a dozen years. He has submitted multiple requests to UDOC requesting treatment. He was told by a UDOC physician that the state only allowed funding for 5 or 6 HCV patients in the UDOC to be treated with DAA medications each year. In response to his first level grievance, Ellis was told by a UDOC nurse that the UDOC "simply does not have the funding to treat everyone" with chronic HCV. He filed a level two grievance and was told by another nurse that he was not eligible to receive treatment based on the UDOC HCV treatment protocol. He continues to be denied treatment.

*Plaintiff Ronald May*

Ronald May ("May") was diagnosed with HCV in approximately 2000. In response to a request for HCV treatment, May was told by the UDOC Clinical Services Bureau Director, that he was not currently eligible for DAA medication treatment under the UDOC HCV treatment protocol. He continues to be denied treatment.

*Plaintiff Toby Garcia*

Toby Garcia ("Garcia") was diagnosed with HCV in the late 1990's. He is frequently plagued with severe fatigue. He has sought treatment with DAA medications from UDOC. In a

letter he received in response to his request, he was told "We do not have funds to treat everybody as the cost is very high, it is reserved for those who are the most ill."

*Class Plaintiffs*

Thousands of UDOC prisoners are similarly situated to the named Plaintiffs herein. Their illnesses will advance, subjecting them to an unreasonable risk of serious damage to their health and well-being, unless this Court enjoins Defendants' unlawful conduct.

ARGUMENT

*Standards for the Issuance of a Preliminary Injunction*

Fed.R.Civ.P. 65 governs the issuance of preliminary injunctions. A party requesting a preliminary injunction must establish that: (i) there is a substantial likelihood of success on the merits; (ii) the party will suffer irreparable injury unless the injunction issues; (iii) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (iv) the injunction, if issued, would not be adverse to the public interest.[35] Here, a preliminary injunction is both necessary and appropriate because each of these elements is satisfied.

***Plaintiffs Have a Substantial Likelihood of Prevailing on the Merits of Their Claims***

Plaintiffs Raise Several Claims in this action, including: (1) That Defendants' conduct violates the Eighth Amendment to the United States Constitution in that Defendants are acting with deliberate indifference to the serious medical needs of Plaintiffs; (2) that Defendants' conduct fails to comport with the mandates of the Americans with Disabilities Act ("ADA"); and (3) that Defendants' conduct violates the Rehabilitation Act.

---

[35] *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005); *ULBA v. Leavitt*, 256 F.3d 1061, 1066 (10 Cir. 2001); Fed. R. Civ. Pro. 65.

A.  *There is a Substantial Likelihood Plaintiffs Will Succeed on the Merits of Their Eighth Amendment Claims*

Prison officials violate the Eighth Amendment when they act with deliberate indifference to the serious medical needs of inmates.[36] "Deliberate indifference" involves both an objective and a subjective component. The objective component is met if the deprivation is "sufficiently serious."[37] The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety."[38] Even a brief delay in providing necessary treatment may be unconstitutional.[39]

i.  *Plaintiffs and the Plaintiff Class Suffer from a Serious Medical Need and the objective prong of the deliberate indifference inquiry is therefore satisfied*

A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[40] A delay in medical care is sufficiently serious and actionable under the Eighth Amendment if the "delay resulted in substantial harm," i.e., "lifelong handicap, permanent loss, or considerable pain."[41] Moreover, in the context of an inmate seeking injunctive relief, "[t]here is no requirement that [they] suffer serious medical problems before the condition

---

[36] *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)

[37] *Id.* at 834.

[38] *Id.* at 837.

[39] *Id. (*citing *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir.1991) ("prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering"); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir.1990) (few hours delay in treating inmate's broken foot could render defendants liable); *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir.1985) (fifteen minute delay in treating inmate in cardiac arrest may violate Eighth Amendment).

[40] *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir.1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980) (further quotation omitted)).

[41] *Id.* (*quoting Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

is actionable."[42] As the Supreme Court has recognized, "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life threatening condition in their prison on the ground that nothing yet had happened to them."[43]

Plaintiffs (by diagnosis) and Plaintiffs' class (by definition) all suffer from chronic HCV and continue to suffer substantial risks of serious and potentially irreparable harm, including abdominal pain, widespread itching, kidney disease, jaundice, bruising and bleeding, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines which can burst), abdominal ascites (the accumulation of fluid), mental confusion, memory loss, personality changes, sleep disorders, lymph disorders, liver cancer, and death.[44]

Since introduction of DAA medications, multiple courts considering the question have held that chronic HCV is a "serious medical need."[45]

---

[42] *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001).

[43] *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

[44] United States National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, Symptoms & Causes of Cirrhosis, available at https://www.niddk.nih.gov/health-information/liver-disease/cirrhosis/symptoms-causes (last visited September 15, 2019).

[45] *See Loeber v. Andem*, 487 F. App'x 548, 549 (11th Cir. 2012) ("That Hepatitis C presents a serious medical need is undisputed."); *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) ("HIV and hepatitis meet either of the[] definitions" of a serious medical need and "defendants wisely do not deny that [Plaintiff] has serious medical needs."); *Postawko v. Missouri Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 WL 1968317, at *5 (W.D. Mo. May 11, 2017) ("Plaintiffs allege that they have been diagnosed with HCV, which the Eighth Circuit has characterized as being unquestionably a serious medical problem.") (quotation/citation omitted); *Abu-Jamal v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, at *11 (M.D. Pa. Jan. 3, 2017) ("Chronic hepatitis C constitutes a serious medical need."); *Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("Case law also recognizes that Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis."); *Ibrahim v. District of Columbia*, 463 F.3d 3, 7 (D.C. Cir. 2006) (hepatitis C presents "imminent danger" of "serious physical injury"); *Chimenti v. Wetzel*, 2018 U.S. Dist. LEXIS 115961, 2018 WL 3388305 (at pg. 35) United States District Court for the Eastern District of Pennsylvania  July 12, 2018, Decided; July 12, 2018 ("We conclude that the record contains evidence that patients who have chronic

The need for treatment is also obvious to a layperson. Chronic HCV causes inflammation and scarring of the liver that is accompanied by serious and life-threatening complications. There is also a substantial risk of death—patients with decompensated cirrhosis (which can result from untreated chronic HCV) have a mere 50% survival rate over five years. Thus, it would be obvious to a layperson that a condition with such symptoms and risk of serious complications is one that requires treatment.

> *ii. Defendants know of and have disregarded an excessive risk to the health or safety of Plaintiffs and the members of the Plaintiff Class and the objective prong of the deliberate indifference inquiry is therefore satisfied.*

The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind.[46] This subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference."[47] However, "deliberate indifference does not require a finding of express intent to harm,"[48] but only a showing that a prison official "consciously disregard[ed] a substantial risk of serious harm."[49] The necessary scienter lies "somewhere between the poles of negligence at one end and purpose or knowledge at the

---

HCV and whose [liver fibrosis] scores are less than F2 have serious medical needs, as they may suffer from fatigue and other non-hepatic symptoms of their infections and, if not treated with DAAs before their disease progresses, may suffer from liver inflammation, liver fibrosis, liver cancer and liver-related mortality that they would not suffer if they were treated with DAAs while their [liver fibrosis] scores are in the F0 to F1 range.").

[46] *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005)(citing *Estelle v. Gamble*, 429 U.S. 97 (1976)).
[47] *Farmer*, 511 U.S. at 837.
[48] *Mata* 427 F.3d at 752 (quoting *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir.1996)).
[49] *Farmer* at 511 U.S. at 836-38

other."[50] Moreover, conscious disregard of a substantial risk of serious *future* harm constitutes deliberate indifference. In the same way that "a prison inmate . . . [can] successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery[,]" a prisoner can complain about the failure to treat HCV without waiting for his liver to fail.[51]

By refusing to treat their chronic HCV, Defendants have subjected Plaintiffs and the class members to the substantial and unreasonable risk of serious harm including irreversible cirrhosis, liver disease, liver cancer, and death.  Defendants are aware that Plaintiffs and the Plaintiff Class are suffering from untreated chronic HCV, as evidenced by Plaintiffs' repeated complaints to medical staff and in grievances as well as Defendants' own responses to Plaintiffs' grievances. Further, Defendants know or have recklessly disregarded the fact that more than 2,000 other inmates in the custody of UDOC are almost certainly infected with HCV and are not receiving the minimum standard of care. UDOC became aware that DAA medications are the standard of care for treatment of those diagnosed with chronic HCV at least as early as 2014.[52] Nevertheless, Defendants adopted policies and practices that deny DAA treatment to nearly all inmates with chronic HCV. Defendants have caused a complete denial of readily available treatment, and have done so despite knowing the serious risks faced by the Plaintiffs and Plaintiffs Class. Defendant's actions amount to clear deliberate indifference. As discussed above, it is not necessary or sensible to wait until Plaintiffs or class members develop these serious complications—an injunction is necessary to prevent them.

---

[50] *Farmer*, 511 U.S. at 836.
[51] *Helling*, 509 U.S. at 35.
[52] Margot Sanger-Katz, Why the Hepatitis Cure Sovaldi is a Budgetary Disaster for Prisons, The New York Times, Aug. 7, 2014, Pl.'s Ex. 1, p. 3, ("We don't have a choice—it's the new standard of care," according to then-UDOC Medical Director Richard Garden).

*iii. Other Courts Addressing the Issue Have Found Denial of DAA Drugs to Constitute Deliberate Indifference.*

In a case nearly identical to this one, the Western District of Missouri found that a prison system's refusal to provide DAA medications to prisoners with chronic HCV stated a claim for deliberate indifference, where the prison had treated only five of the approximately 4,736 HCV-infected prisoners.[53] Other courts have also concluded that failing to provide DAA treatment to prisoners with chronic HCV may constitute deliberate indifference to serious medical needs.[54]

*iv. Other Courts Addressing the Issue Have Found the Issuance of a Preliminary Injunction Necessary and Appropriate to Prevent Further Irreparable Harm.*

At least two federal courts have issued preliminary injunctions ordering a prison system to treat an HCV-positive prisoner with DAA medications, holding that failure to do so was deliberate indifference to the prisoner's serious medical needs.[55] In *Abu-Jamal v. Wetzel,* the

---

[53] *See Postawko v. Missouri Department of Corrections*, 2017 WL 1968317, at *6-10 ("However, despite this awareness [of the standard of care], Defendants follow a policy or custom that categorically denies DAA drug treatment to inmates with chronic HCV.")

[54] *See Allah v. Thomas*, No. 16-3103, 2017 WL 568313, at *3 (3d Cir. Feb. 13, 2017) (reversing dismissal of Eighth Amendment claim and finding that failure to provide DAA medications to prisoner stated claim for deliberate indifference to serious medical need); *Horton v. Guzman*, 2017 WL 1233028, at *3 (N.D. Ill. Apr. 4, 2017) (denying motion to dismiss and finding plaintiff who was denied DAA drugs and a liver transplant evaluation stated a claim for deliberate indifference); *King v. Henry*, 2016 WL 5024228, at *8 (S.D. Ga. Sept. 16, 2016), report and recommendation adopted, 2016 WL 6272386 (S.D. Ga. Oct. 25, 2016) ("Eleventh Circuit precedent has long made clear that a prison official's failure to provide a prisoner treatment for his Hepatitis C violates the Eighth Amendment"); *Shabazz v. Schofield*, No. 3:13-CV-00091, 2016 WL 4177085, at *4 (M.D. Tenn. Aug. 8, 2016), report and recommendation adopted, 2016 WL 4480132 (M.D. Tenn. Aug. 25, 2016) (denying prison officials' motion for summary judgment on claim for failure to provide DAA medications); *Bernier v. Trump*, No. 16-CV-00828 (APM), 2017 WL 1048053, at *7 (D.D.C. Mar. 17, 2017) (denying motion to dismiss Eighth Amendment claim where prisoner sought DAA medications); *Reid v. Clarke*, No. 7:16-CV-00547, 2017 WL 706352, at *5 (W.D. Va. Feb. 22, 2017) (same).

[55] *See Abu-Jamal v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, at *11 (M.D. Pa. Jan. 3, 2017); *Hoffer v. Jones*, 290 F.Supp.3d 1292 (2017).

United States District Court for the Middle District of Pennsylvania found the prison's policy, which, like the policy of Defendants herein, did not permit treatment unless a prisoner had advanced fibrosis or cirrhosis, "present[ed] a conscious disregard of a known risk that inmates with fibrosis, like Plaintiff, will suffer from hepatitis C related complications[.]"[56] "Simply put, Defendants, pursuant to [prison] policy, deliberately chose a course of monitoring over treatment [with DAA drugs] for non-medical reasons and are allowing Plaintiff's condition to worsen while his liver function and his health continues to deteriorate."[57] Similarly, in *Hoffer v. Jones*[58], the court issued a preliminary injunction against a prison administration requiring them "to ensure that inmates with HCV receive medical care [by treatment by DAA drugs] in a timely manner consistent with constitutional requirements." The situation in the case at bar is virtually identical to that in both *Abu-Jamal* and *Hoffer.*

Defendants have no justification for departing from the established standard of care—immediate treatment for all prisoners with chronic HCV, regardless of their symptoms or level of fibrosis—failure to follow known established standards of care is deliberate indifference. As the medical community, the HCV Guidance and the CDC all agree, using the presence of serious complications or the level of fibrosis to determine whether to provide treatment is dangerous, inappropriate, and withholds treatment from those who would benefit the most from it.[59]

---

[56] *Id. at 11.*
[57] *Id.* at 14
[58] 290 F.Supp.3d 1292 (2017)
[59] HCV Guidance – When and in Whom to Initiate HCV Therapy, available at https://www.hcvguidelines.org/evaluate/when-whom (last visited August 13, 2019); CDC Hepatitis C Information, Overview, available at https://www.cdc.gov/hepatitis/hcv/cfaq.htm (last visited July 3, 2019).

*v. Costs Cannot Justify Withholding Life-Saving Medications from Inmates*

Finally, costs cannot justify withholding life-saving medications from incarcerated

people. The Eleventh Circuit has specifically addressed whether financial limitations can justify

withholding necessary medical treatment to inmates:

> We do not agree that financial considerations must be considered in determining the
> reasonableness of inmates medical care to the extent that such a rationale could ever be
> used by so-called "poor states" to deny a prisoner the minimally adequate care to which
> he or she is entitled. Minimally adequate care usually requires minimally competent
> physicians. It may also sometimes require . . . the administration of expensive medicines.
> . . . We are aware that systemic deficiencies in medical care may be related to a lack of
> funds allocated to prisons by the state legislature. Such a lack, however, will not excuse
> the failure of correctional systems to maintain a certain minimum level of medical service
> necessary to avoid the imposition of cruel and unusual punishment.[60]

---

[60] *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (quotations/citations omitted); *See also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985)("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment."); *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) ("Lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations."); *Abu-Jamal*, 2017 WL 34700, at *20 ("[T]he economics of providing this [DAA] medication cannot outweigh the Eighth Amendment's constitutional guarantee of adequate medical care."); *Watson v. City of Memphis*, 373 U. S. 526, 537 (1963) (". . . vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny [them] than to afford them." — desegregation of public parks); *Rozecki v. Gaughan*, 459 F. 2d 6, 8 (1st Cir. 1972) ("Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations." — prison heating system); *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir. 1968) ("Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . ." — rehabilitative devices); *Hamilton v. Love*, 328 F.Supp. 1182, 1194 (E.D.Ark.1971) ("Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights."— pre-trial detention unit); *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir.1977) ("It should not need repeating that compliance with constitutional standards may not be frustrated by legislative inaction or failure to provide necessary funds."); *Saenz v. Roe*, 526 US 489, 507 (1999)(State's legitimate interest in saving money provides no justification for its decision to fails to comply with the obligations imposed by the Fourteenth Amendment).

Defendants cannot refuse to provide life-saving medications simply because they may be expensive.

For the foregoing reasons, Plaintiffs and class members have a substantial likelihood of prevailing on the merits of their Eighth Amendment Claim and the issuance of a preliminary injunction is both necessary and appropriate.

**Plaintiffs and the Plaintiff Class Have a Substantial Likelihood of Success on the Merits of Their ADA and RA Claims**

With the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable."[61]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[62] This provision extends to discrimination against inmates ..."[63]

In order to state an RA or ADA claim, a plaintiff generally must prove that (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.[64]

The ADA and RA apply to the UDOC because it is a "public entity" as defined by Title II

---

[61] *Arenas v. Georgia Department of Corrections*, n.4, (SD Georgia 2017) (citing *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005); *Cash v. Smith*, 231 F.3d 1301, 1305 & n. 2 (11th Cir. 2000)).
[62] 42 U.S.C. § 12132.
[63] *Robertson v. Las Animas County Sheriff's Dept.,* 500 F. 3d 1185, 1193 (10th Cir. 2007).
[64] *See* 42 U.S.C. § 12132; *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir.2006).

of the ADA and receives federal funding.[65] Thus, Defendants may not discriminate against qualified individuals with disabilities on the basis of disability in the "services, programs, or activities of a public entity."[66]

### i. Prisoners with chronic HCV are qualified individuals with a disability

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[67] Although they only need qualify under one prong to seek relief, Plaintiffs and the class members qualify under all three.

First, chronic HCV is a physiological disorder or condition that affects one or more of the body's systems, including the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore an impairment.[68] This physical impairment substantially limits one or more major life activity, including eating, walking, bending, lifting, concentrating, thinking, and communicating.[69]

The term "substantially limits" must be "construed broadly in favor of expansive coverage."[70] The regulations even list certain conditions—including cancer, diabetes, and HIV— that will virtually always be found to impose a substantial limitation on a major life activity, thus precluding the need for an individual assessment.[71] Chronic HCV is akin to these conditions.  It

---

[65] 42 U.S.C. § 12131(1)[65]; 28 C.F.R. § 35.104
[66] 42 U.S.C. § 12132.
[67] 42 U.S.C. § 12102(1).
[68] 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b).
[69] *See* 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).
[70] 28 C.F.R. § 35.108(d)(1)(i)-(ii).
[71] *Id.* at § 35.108(d)(2).

universally affects liver function and thus will virtually always be deemed a disability. Thus, all class members have a qualifying disability.[72]

Second, Plaintiffs and the class members all have a record of having an impairment that substantially limits one or more major life activity, as they have a history of such an impairment.[73] Plaintiffs have been diagnosed with HCV, and UDOC records some of their symptoms in their medical records, and responds to their requests/grievances for DAA treatment, all of which produces records of their impairments.

Third, Plaintiffs and the class members are regarded by UDOC as has having an impairment that substantially limits one or more major life activity, as the UDOC perceives them as having such an impairment.[74]

### ii. The UDOC has withheld medical services from Plaintiffs and the Plaintiffs' Class and thereby discriminated against them because of their disability.

The ADA forbids public entities from excluding individuals from participation in, or denying them the benefits of, a public entity's services, programs, or activities, or discriminating against them because of a disability.[75] The ADA also requires public entities to provide equal access and enjoyment of all services[76] and prohibits them from using criteria or methods that have the effect of subjecting individuals with disabilities to discrimination or that defeat or

---

[72] *See Quick v. Tripp, Scott, Conklin & Smith, P.A.*, 43 F. Supp. 2d 1357, 1367–68 (S.D. Fla. 1999) ("[T]he significant limitations placed on [] major life activity . . . due to the Hepatitis C virus, qualifies as a recognized ADA disability") (*citing Bragdon v. Abbott*, 524 U.S. 624, 638 (1998) (finding that HIV is a qualified disability under the ADA)).
[73] *See* 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e)
[74] *See* 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f).
[75] 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).
[76] 28 C.F.R. § 35.130(b)(1)

substantially impair accomplishment of the objectives of any program, service, or activity.[77]

Here, the UDOC categorically denies prisoners with chronic HCV access to necessary medical services while at the same time not imposing such a ban on prisoners with other disabilities, or non-disabled prisoners in violation of the ADA.[78] This categorical ban discriminates against prisoners with chronic HCV and denies them medical services because of their disability.

For the reasons set forth above, Plaintiffs are substantially likely to succeed on the merits of their ADA and RA claims.

## II. Plaintiffs and the Plaintiff Class Will Continue to Suffer Irreparable Injury in the Absence of a Preliminary Injunction.

In the context of Eighth Amendment claims challenging conditions of confinement, "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm."[79] Moreover, "the irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent."[80] "'[I]njunctive relief is appropriate to prevent a substantial risk of serious injury from ripening into actual harm.'"[81]

Plaintiffs and the Plaintiff Class face a substantial risk of irreversible cirrhosis, advanced

---

[77] 28 C.F.R. § 35.130(b)(3).
[78] *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998)
[79] *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002) (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir. 1998).
[80] *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (affirming permanent injunction against FDC Secretary enjoining staff from using chemical agents on certain prisoners).
[81] *Id.* at 1318 (quoting *Farmer*, 511 U.S. at 845).

liver disease, liver cancer, and death.  Additionally, class members suffer, or are at risk of

suffering, from the associated complications such as widespread itching, fluid retention, internal

bleeding, varices, ascites, mental confusion, and possible death. See Abu-Jamal, 2017 WL

34700, at *20 (granting preliminary injunction and finding that prisoner will suffer irreparable

harm without DAA medications). The class members will suffer from these irreparable harms

without injunctive relief.

### III. The Harm Suffered by Plaintiffs and the Plaintiff Class Outweighs Any Potential Harm to Defendants

Defendants will suffer no harm from having to comply with their responsibilities under

the Constitution, the ADA, and the RHA.

Any financial and administrative burdens that may be borne by Defendants cannot, as a

matter of law, justify the substantial harms that Plaintiffs and class members continue to suffer.[82]

Plaintiffs' risk of further suffering, damage to their health, and possible death far outweigh any

burdens Defendants may suffer.  The balance of equities weighs strongly in Plaintiffs' favor.

### IV. The Public Interest Supports Injunctive Relief

"[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no

longer be violated."[83] There will be no harm to the public by ensuring that Defendant provides

constitutionally adequate medical care.  "In fact, it seems clear . . . that, in the long run,

providing decent medical care and housing to inmates would serve to promote the rehabilitative

---

[82] See Laube, 234 F. Supp. 2d at 1252; Ancata, 769 F.2d at 705.
[83] Id. at 1252.

goals of the criminal justice system."[84] It serves the public interest to carry out the mandates of the Constitution.

## V. Plaintiffs Should Not be Required to Post Bond

Federal Rule of Civil Procedure 65 permits a trial court to require no bond prior to the issuance of a temporary restraining order where the non-moving party failed to demonstrate any potential injury. A trial court has wide discretion in the manner of requiring security and if there is an absence of proof showing the likelihood of constitutionally recognized harm no bond is necessary.[85] Plaintiffs suggest that since Defendants will suffer no constitutionally recognized harm by the issuance of the injunction sought herein, that no security or nominal security in the amount of one dollar ($1.00) be required.

## VI. The Proposed Injunction Satisfies the PLRA

For cases "with respect to prison conditions," the Prison Litigation Reform Act (PLRA) states that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."[86] A court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.*

However, the PLRA standard does not create a higher substantive hurdle beyond what

---

[84] *Costello v. Wainwright*, 397 F. Supp. 20, 37 (M.D. Fla. 1975) (granting preliminary injunction ordering many improvements to Florida's prison system). This opinion was affirmed, 525 F.2d 1239 (5th Cir. 1976), then vacated in part on rehearing en banc, 539 F.2d 547 (5th Cir. 1976).
[85] *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964).
[86] 18 U.S.C. § 3626(a)(2).

already exists for federal court injunctions—it merely requires the Court to make the specific

findings.  *See Gilmore v. People of the State of California*, 220 F.3d 987, 1006 (9th Cir. 2000)

(calling the needs-narrowness-intrusiveness test "a nearly identical standard" to the pre-PLRA

standard); *Smith v. Arkansas Dep't of Correction*, 103 F.3d 637, 647 (8th Cir. 1996) (PLRA

"merely codifies existing law and does not change the standards for determining whether to grant

an injunction").

      In any event, the proposed injunction clearly complies with the PLRA.  The relief is

narrowly drawn, as the "scope of the remedy" is "proportional to the scope of the violation."[87]  It

does not require broad reforms to all forms of medical care, but only applies to a specific medical

condition to which Defendants have been unconstitutionally responding.  Similarly, the relief

extends no further than necessary to correct the harm to the Plaintiff Class and is the least

intrusive means necessary to correct the harm, as the proposed injunction merely requires

Defendant to follow the prevailing standard of care and constitutional mandates.  This remedy

can be implemented through the channels that Defendant already has in place for providing

medical care.

      Regarding the public safety and criminal justice component, the PLRA "does not require

the court to certify that its order has no possible adverse impact on the public."[88]  But none will

occur here.  No harm to public safety will result from providing constitutionally adequate

medical care.

---

[87] *Brown v. Plata*, 131 S. Ct. 1910, 1940 (2011).
[88] *Id.* at 1941

**ORAL ARGUMENT REQUESTED**

Plaintiffs respectfully request that oral argument be held on this motion and believe that it would assist the Court.

**CONCLUSION**

Thousands of Utah prisoners have been suffering from chronic HCV, and remain at risk for serious future complications, and even death, despite the fact that there is a simple cure for their disease.  Plaintiffs seek a preliminary injunction from this Court requiring Defendants to provide these prisoners with the treatment they so desperately need.

WHEREFORE Plaintiffs and the Plaintiff Class respectfully request the following relief:

A. A preliminary injunction ordering Defendant to 1) immediately provide direct-acting antiviral (DAA) medications to the named Plaintiffs, 2) develop and adhere to a plan to timely provide DAA medications to all UDOC prisoners with chronic HCV.

B. A preliminary injunction ordering Defendant to 1) provide routine opt-out testing for HCV to all UDOC prisoners; 2) properly evaluate, monitor, and stage UDOC prisoners with HCV (including screening for liver cancer where appropriate); and 3) provide all necessary and appropriate follow-up monitoring and care to UDOC prisoners with chronic HCV.

C.      An order waiving the posting of a bond for security.

D.      Such other relief that the Courts deems just and equitable.

Respectfully submitted this 12th day of November 2019.

/s/ Stewart Gollan

_____

Stewart Gollan, USB # 12524
GOLLAN LAW, PLLC
584 Wall Street
Salt Lake City, Utah 84111
sgollanlaw@gmail.com
Telephone: (801) 413-3406

## CERTIFICATE OF SERVICE

I certify that on the 12th day of November 2019 I caused a true and correct copy of the foregoing PLAINTIFFS' MOTION FOR PLELIMINARY INJUNCTION to be transmitted to the following *via* the Court's ECF system:

MICHAEL J. TETER (16734)
VANESSA R. WALSH (16180)
Assistant Utah Attorneys General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
E-mail: mteter@agutah.gov
          vwalsh@agutah.gov
*Attorneys for State Defendants*

WILLIAM L. SCHMIDT, SBN 206870[89]
legal.schmidt@gmail.com
WILLIAM L. SCHMIDT, ATTORNEY
AT LAW, P.C.
P.O. Box 25001
Fresno, CA 93729
Telephone: (559) 261-2222
Facsimile: (559) 436-8163

R. SHANE JOHNSON, Utah Bar No. 14217
shane@utahdefense.com
R. SHANE JOHNSON, PLLC
24 D Street
SALT LAKE CITY, UTAH 84103
Telephone: (801) 364-2222

Dated November 12, 2019

                              */s/ Stewart Gollan*
                              *Attorney for Plaintiffs and Proposed*
                              *Plaintiff Class*

---

[89] Admitted *Pro Hac Vice*

EXHIBIT A

## USP Hepatitis C Treatment Protocol (Revised 10/30/2017)

### Monitoring

Each case of Hepatitis C will be evaluated per individual needs.

Before an inmate will be reviewed in clinic, a pre-evaluation will be completed. This evaluation may include the following tests, but is not inclusive of all testing that may be done.

A pre-evaluation monitoring is completed on Hepatitis C positive patients to determine appropriateness for clinic.

The Pre-evaluation includes the following:

1 – A Hepatitis panel to identify liver disease with the virus.

2 – Liver Function test (LFT) and Complete Blood Count (CBC, for platelet count):

*Your current status. All labs are normal*

a. Lab tests done after initial diagnosis. If both are normal or not significantly abnormal, the inmate will be instructed to request testing yearly or sooner if issues of concern occur.
b. Testing also may be done per patient need and/or request.
c. If the LFTs are consistently elevated and platelets are below 90, levels will be checked every 6 months for 2 years.
d. LFTs must be consistently elevated 2 times normal values. Platelets must show decreasing trend.
e. Must have supportive labs and testing evident of significant, Grade 4, liver disease with severe fibrosis.

*You do not meet these requirements*

3 – Other labs/ testing that may be done to aid in assessing liver disease progress:

a. HCV PCR
b. HCV genotype
c. Liver biopsy
d. Fibrosis 4 Score (Fib Score).

4 – Drug Screening and History: The patient must be drug free for two (2) years prior to consideration for treatment.

5 – Continuity of Care: The patient must have a remaining incarceration time of at least one (1) year to allow for treatment and follow up.

6 – Housing: The patient will remain at Draper site during treatment and follow up.

### Treatment

The Utah Department of Corrections is seeking special funding to support the treatment with new HCV medications due to the tremendous financial burden of this program.

Funding for Hepatitis C treatment at this time is limited.  Only the most ill patients will qualify for treatment as funding is approved from the State Legislature.

Once considered for treatment, medication regime will be reviewed per UMC (University Medical Center) specialist consult recommendations through clinic or Telemed visits.

As each genotype and level of liver disease will require individual treatment regime, medication for treatment will be based on recommendations by the UMC specialist(s).

After an inmate is seen by the UMC specialist, he/she will be reviewed by the HCV treatment committee to be considered for treatment.

An Ethics Review Board is being utilized to review candidates for HCV treatment.

Board to include:

1. Dr. Bruce Burnham

2. Dr. Gabe Power or appointed Physicians Assistant

3. Colleen Guymon, RN, ICC

4. Craig Jensen, RN

5. Jason Jackman, RN

6. Aaron Douglas, RN, Chronic care

7. Blitch Shuman, RN, Deputy Warden

8. Mike Hogland or Mental Health Appointee

9. Dena Kenyon, Pharmacist

10. Consulting Specialist at University of Utah Medical Center, Dr. Tietze, Telemed

11. Person appointed by Director Cook

The Ethics Review Board will review many issues including:

1. Date to parole/release

2. Lab values

3. Medical Compliance

4. Life expectancy

5. Co-morbidities

6. Mental Illness

7.  Drug use history and screening results

8.  Budget

9.  Waiting period (2 years)

*From Utah Department of Health, "A Brief Guide to Hepatitis C for People in Prison or Jail"*

*Here are some important things to know about HCV.  HCV is treatable and in many cases is curable. Treatment means taking multiple medications for many weeks. There are side effects.*

*Not everyone with hepatitis C needs treatment right away.*

*Most people with HCV do not get sick for many years and some won't get sick at all.*

*Doctors think about many things to decide when treatment is right for you and the likelihood you will respond to treatment.*

*Many new medications are going to be released soon to treat HCV.*

*Compared to the medications that are being used now, new HCV medications will be taken for shorter periods of some, have less side effects, and higher chances for a cure.*

*Prisons will usually consider how long your sentence is to make sure you will be in prison long enough to finish treatment."*


Approved by Clinical Director or Designee _____

Date_____

30